**FILED**

SEP 20 2023

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

In The Matter of the Extradition of §
§
§   CASE NUMBER: EP:23-M-03039-MAT
SAUL LUNA VILLA, §
a/k/a Saul Luna, a/k/a "Pantera" §
§
§

## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to Mexico,[1] respectfully requests that the fugitive in this case, of Saul Luna Villa, a/k/a Saul Luna, a/k/a "Pantera" ("Luna Villa"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Luna Villa should be detained. In short, Luna Villa should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight or danger to the community, and that special circumstances exist warranting his release.

### BACKGROUND

Mexico seeks Luna Villa's provisional arrest, with a view toward his extradition, for prosecution for aggravated femicide, as defined in Article 126 Bis of the Criminal Code for the

---

[1] The Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, *as amended by* the Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. TREATY DOC. NO. 105-46 (1998) ("Treaty").

State of Chihuahua, Mexico. On April 14, 2023, the Judge of First Instance of the Accusatory Criminal System of the Bravos Judicial District of the State of Chihuahua issued an arrest warrant for Saul Luna Villa; the warrant remains outstanding. The facts underlying Mexico's criminal charges and arrest warrant against Luna Villa are as follows:

On April 7, 2023, at 7:24 p.m., law enforcement authorities in Mexico received a 911 call reporting the discovery of a dead body at the intersection of Paseo del Norte and Agustín Barbachano streets in the Anáhuac neighborhood in Ciudad Juárez, Chihuahua. The body was that of a female of dark complexion and brown hair, wearing blue denim shorts and a beige blouse. The autopsy report identified the cause of death as encephalic and thoracoabdominal viscera laceration due to firearm projectiles fired in the skull and thorax.

On April 8, 2023, C. I. V. F. ("Witness #1"), the victim's mother, identified the body to Mexican law enforcement as that of her daughter A. M. B. V. ("the victim"). That same day, Witness #1 provided a statement to Mexican authorities. Witness #1 provided the following information:

On April 7, 2023, at 1:00 p.m, Witness #1 received a call from the victim, who said she was going out with LUNA VILLA that night. When Witness #1 arrived home that evening, the victim told Witness #1 that LUNA VILLA was arranging for the victim to cross to El Paso, Texas, and that LUNA VILLA wanted to see the victim that night to give the victim money for her passage. Witness #1 told the victim that Witness #1 could not take care of the victim's children because Witness #1 was tired. The victim told Witness #1 that LUNA VILLA would pay Witness #1 to take care of the victim's children. The victim then called LUNA VILLA and put him on the phone with Witness #1. LUNA VILLA asked for Witness #1's permission to go

out with the victim that night, indicating that he did not care about the rules and wanted to see the victim despite his status as a military serviceman who is not allowed to cross the border. Witness #1 granted the victim permission and gave the victim 100 Mexican pesos for her Uber ride to meet LUNA VILLA. The victim's sister, L. B. V., accompanied the victim from Witness #1's residence to the street, where the victim got the Uber ride.

At approximately 7:20 p.m., Witness #1 received from the victim's phone a photograph of her daughter, alive, in a vehicle. Witness #1 noted seeing what Witness #1 believed to be LUNA VILLA's right arm in the photograph, with his tattoo partially visible.

Approximately five minutes later, Witness #1 received a phone call from LUNA VILLA asking if the victim had arrived home. Witness #1 was surprised and told LUNA VILLA that the victim was not home, and that the victim had just sent a photograph of the victim and LUNA VILLA together. Witness #1 ended the call with LUNA VILLA and tried to call the victim, but the victim did not answer. LUNA VILLA called Witness #1 again approximately ten minutes later asking if Witness #1 knew anything about the victim's whereabouts. Witness #1 answered that she did not.

Witness #1 indicated that she knew LUNA VILLA because her daughter had a four-year relationship with him, after meeting LUNA VILLA on Facebook. Witness #1 stated that Witness #1 could recognize LUNA VILLA because Witness #1 had seen him during videochats and in photographs. Witness #1 identified a photograph as depicting LUNA VILLA. Mexican authorities provided a copy of the photograph identified by Witness #1.

On April 18, 2023, A. R. M. R. ("Witness 2"), an Uber driver, provided a statement to Mexican authorities. According to Witness #2, on April 7, 2023, at 6:31 p.m., Witness #2 picked

up a female passenger at Calle Juan Ibarra #6833, colonia Electricista.[2] Witness #2's passenger had light brown skin, long dark hair, beige tank top, dark denim shorts, and a tattoo of a "devil" on her neck.[3] Witness #2 drove his passenger to the "Smart de Navojoa" store at 6:50 p.m. Witness #2 overheard the passenger call someone informing him that she had arrived at the arranged pick up location. After dropping her off, Witness #2 saw his passenger get into a black GMC truck driven by a male wearing a white shirt.

While analyzing the area where the body was found, Mexican law enforcement noticed that a house had security cameras pointed in the direction of Paso del Norte and Agustín Barbachano streets in the Anáhuac neighborhood where the body was discovered. Video footage from those cameras shows the following:

    i.    At 19:20:46 hrs., a black 4-door truck of not very recent model arrives.

    ii.    At 19:20:53 hrs., the black truck comes to a halt.

    iii.    At 9:20:59 hrs., a man wearing a white T-shirt gets out of the driver's door of the black truck, runs towards the front passenger door, and opens it.

    iv.    At 19:21:02 hrs., the same man lowers a "bundle" from the passenger seat and deposits it on the ground on Paso del Norte Street at the intersection with Agustín Barbachano in the Anáhuac neighborhood, the place where the victim was found dead.

    v.    At 19:21:09 hrs., the same man runs towards the driver's door to get into the vehicle.

---

[2] According to Mexican authorities, this is the address of Witness #1's home.

[3] According to Mexican authorities, Witness #1 provided a photograph of the victim showing a tattoo on her neck that matches the description provided by Witness #2.

vi. At 19:21:15 hrs., the subject leaves in the black truck.

Records provided by the U.S. Department of Homeland Security show that on April 7, 2023, at 8:32 p.m., LUNA VILLA made a border crossing to the United States through the Córdova Bridge. Those records also indicate that an all-terrain black GMC truck, with the license plates SHZ3344, is one of the vehicles used by LUNA VILLA to make several border crossings.

On April 8, 2023, S. H. ("Witness #3"), a friend of the victim, provide a statement to Mexican authorities. According to Witness #3, Witness #3 had been friends with the victim since 2019 and had lived with the victim in Ciudad Juárez. In July 2020, Witness #3 met LUNA VILLA, who was the victim's romantic partner. The relationship between the victim and LUNA VILLA was not good. LUNA VILLA was very jealous and possessive, and the couple argued very often. Those arguments frequently resulted in LUNA VILLA pushing the victim around. In addition, LUNA VILLA was know to insult the victim when the victim did not want to have sex with LUNA VILLA. Witness #3 identified a photograph as depicting LUNA VILLA. Mexican authorities provided a copy of the photograph identified by Witness #3.

The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Luna Villa's arrest. This Court issued the arrest warrant, and Luna Villa was arrested in this District on September 19, 2023. Luna Villa is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

### I. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

#### A. The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the U.S. Secretary of State (the "Secretary") that the evidence the requesting country has provided is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F. 2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.").

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements to certify extraditability—as defined in the applicable extradition treaty, statutes, and case law—are present. *See Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993). If the Court finds that the requirements for certification are satisfied, it must provide the certification to the Secretary, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B. The requirements for certification

A court should certify to the Secretary that a fugitive is extraditable when the following requirements have been met: (1) The judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers each offense for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each offense for which extradition is requested. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Ordinola v. Hackman*, 478 F. 3d 588, 608 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007). The following sections briefly discuss each of those requirements.

#### 1. Authority over the proceedings

The extradition statute authorizes "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State" to conduct extradition proceedings. 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Jimenez v. Aristeguieta*, 311 F. 2d 547, 553–55 (5th Cir. 1962) (any judicial officer in class authorized by statute may conduct extradition hearing); *Austin v. Healey*, 5 F. 3d 598, 601–02 (2d Cir. 1993) (finding magistrate judge authorized to conduct extradition hearing without specific delegation of

authority); *Ward v. Rutherford*, 921 F. 2d 286, 287 (D.C. Cir. 1990) (finding that statute and local rule made plain magistrate judge's authority to conduct extradition hearing).

        2.      Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Luna Villa, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

        3.      Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See, e.g., In re Chan Kam-Shu*, 477 F. 2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F. 3d 165, 171 (3d Cir. 1997). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Mexico. The State Department's conclusion that the Treaty is in full force and effect, as expressed in this declaration, is entitled to deference. *See, e.g., Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given

great weight").

4. Crime covered by the Treaty

An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty defines. Article 2 of the Treaty, as relevant here, provides for extradition for willful acts (1) "which fall within any of the clauses of the Appendix" to the Treaty and are punishable by the laws of both countries by deprivation of liberty for at least one year; or (2) "although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties, by a deprivation of liberty the maximum of which shall not be less than one year." Treaty Art. 2. The Appendix to the Treaty expressly provides for extradition for the offense of murder. Treaty, appendix at #1. Moreover, the requesting country need not establish that its crimes are identical to ours. In *Collins v. Loisel*, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should construe liberally the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 298–300 (1933); *see also, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5. Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary, the Court must conclude that probable cause exists to believe that the person before it committed the crime for which Mexico seeks extradition. *See Escobedo*, 623 F. 2d at 1102 & 1105. Probable cause exists if "there is evidence sufficient to show reasonable ground to believe the accused guilty." *Sayne v. Shipley*, 418 F. 2d 679, 685 (5th Cir. 1969); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted); *see Haxhiaj v. Hackman*, 528 F. 3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.") (internal quotation marks omitted); *Hoxha*, 465 F. 3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.").

C. **An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination belongs to the foreign court.

*Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g., Martin*, 993 F.2d at 828.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Likewise, a fugitive generally has no right to discovery. *See, e.g., Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).

The fugitive's right to present evidence is severely constrained, and many constitutional protections applicable in criminal cases do not apply. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or to confront his accusers, *see Ordinola*, 478 F.3d at 608; *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); and no Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993 F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, *see Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins v. Loisel*, 262 U.S. 426, 429 (1923); *In re Extradition of McMullen*, 989 F.2d 603, 612–13 (2d Cir. 1993), *cert. denied*, 510 U.S. 913 (1993).

Hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extradition may be, and usually is, based entirely on the authenticated documentary evidence and information the requesting government has provided. *See Bingham*, 241 U.S. at 517 (stating that

11

requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty"); *Haxhiaj*, 528 F.3d at 292 ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted).

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence the government submits on behalf of the country seeking extradition; rather, the fugitive may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461–62 (1913); *Garza v. United States*, 180 F. App'x 522, 523 (5th Cir. 2006) ("Evidence contradicting the Government's evidence is not permitted at an extradition hearing, so as to avoid a trial of guilt or innocence.") (citing *Collins*, 259 U.S. at 316–17; *Sayne*, 418 F.2d at 685); *In re Extradition of Ramos Herrera*, 268 F. Supp. 2d 688, 696 (W.D. Tex. 2003) (noting that extradition judges "are not expected to decide conflicting factual claims between the [requesting state] and the accused").[4] A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g., Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of

---

[4] The extent to which a fugitive may offer explanatory proof is largely within the court's discretion. *See Koskotas*, 931 F.2d at 175; *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964) (citing cases).

technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry

All matters a fugitive might raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary, not the Court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary should address a fugitive's contention that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *See Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo*, 623 F.2d at 1105. This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II. LUNA VILLA SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, determining whether to release a fugitive on bail is *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141

13

*et seq.*, applies only to "offenses" against the United States that are triable in U.S. courts, and does not apply to international extradition proceedings. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2); *United States v. Risner*, No. 3:18-MJ-765-BN, 2018 WL 6809796, at *5 (N.D. Tex. Dec. 27, 2018).[5] Unlike in domestic criminal cases, "there is no presumption favoring bail" in extradition cases. *In re Extradition of Russell*, 805 F.2d 1215, 1216 (5th Cir. 1986). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A. Applicable law

1. A strong presumption against bail governs in an international extradition proceeding

This presumption against bail in international extradition proceedings is rooted in *Wright v. Henkel*, 190 U.S. 40 (1903), where the Supreme Court explained that when a foreign government makes a proper request under a valid extradition treaty, the United States is obligated to deliver the fugitive:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the

---

[5] The term "offense" for the purposes of Section 3141 is defined in 18 U.S.C. § 3156(a)(2) as "any criminal offense, other than an offense triable by court-martial, military commission, provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress . . . ." Luna Villa is not charged with an "offense" within the meaning of 18 U.S.C. § 3156 but, rather, with an offense he committed in violation of Mexican law.

accused obviously would be surrounded with serious embarrassment.

*Id.* at 62.

Where, as here, the Government of Mexico meets the conditions of the Treaty, the United States is obliged to deliver the fugitive. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See id.*; *see also Leitner*, 784 F.2d at 160–61 (the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Mexico without either remedy or compensation.

> 2. Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community

Given the strong presumption against bail, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release. *See, e.g., Russell*, 805 F.2d at 1216; *United States v. Ramnath*, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008); *Risner*, 2018 WL 6809796, at *6.[6] "This 'special

---

[6] "[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy . . . . [Some] courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted. . . . [and t]here is a negligible minority of courts that

circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering that fugitive, a physician, had "more than sufficient assets available with which to flee").

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989) (flight risk "is not the criteria for release in an extradition case"); *Ramnath*, 533 F. Supp. 2d at 666; *but see Garcia*, 761 F. Supp. 2d at 473 ("[W]hether the test to grant bail in foreign extradition cases is a two-pronged analysis, or whether risk of flight is considered as part of the 'special circumstances' inquiry, remains uncertain in the Fifth Circuit."). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument

---

have adopted a preponderance of the evidence standard." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 481 (S.D. Tex. 2010).

that the district court erred in determining that he was a flight risk); *Salerno*, 878 F.2d at 317–18 (lack of flight risk "is not the criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

Where a fugitive claims special circumstances, "courts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees." *Garcia*, 761 F. Supp. 2d at 472. Courts have considered and rejected a lengthy list of would-be special circumstances – among them:

- The complexity of the pending litigation, *see, e.g., United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g., In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, and/or ties to the community, *see, e.g., Risner*, 2018 WL 6809796, at *22; *Beresford-Redman*, 753 F. Supp. 2d at 1089;

- That the fugitive may have been living openly, *see, e.g., Leitner*, 784 F.2d at 160–61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3–4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g., In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S. D. Tex. June 23, 2008); *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301–02 (S.D. Fla. July 7, 2017); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 173–74 (S.D.N.Y. 2009); *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992); *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g., In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL

1197855, at *3 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. July 3, 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g., Pelletier*, 2009 WL 3837660, at *3–4 (allegedly well-respected businessman); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 131 (E.D.N.Y. Mar. 21, 2001); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581–82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g., Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g., Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297–98; *Antonowicz*, 2017 WL 1197855, at *3; and

- The availability of bail for the same offense in the requesting country, *see, e.g., Antonowicz*, 2017 WL 1197855, at *3; *Garcia*, 615 F. Supp. 2d at 172; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. May 24, 1995).

While in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

  **B. Analysis**

The Court should detain Luna Villa without bond because he poses a flight risk and is a danger to the community.

First, Luna Villa is wanted for prosecution on the violent charge of femicide. Luna Villa is believed to have shot the victim, his girlfriend of four years, several times in the face and neck

and dumped her body on the road before fleeing. Given the violent nature of the alleged offense, Luna Villa's release would pose a danger to the community here and abroad.

Second, Luna Villa poses a significant flight risk because he has a history of evading justice. He is accused of shooting the victim and disposing of her body, then fleeing Mexico to avoid prosecution. A fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction. *See In re Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *3 (N.D. Ill. Dec. 19, 2017) ("In the context of determining whether a [fugitive] poses a substantial risk of flight, there is no meaningful distinction between a person who left a country when he learned of pending charges and one who already outside that country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483).

Now aware that Mexico seeks his extradition from the United States for the serious criminal charge, Luna Villa has incentive to flee further, whether to a third country or to an underground location within the United States. As noted above, the upcoming extradition proceedings are limited in scope and afford him few rights, and the Government's burden of establishing extraditability is relatively light. *See, e.g., Garcia*, 761 F. Supp. 2d at 483 ("The Court believes that [fugitive]'s risk of flight is beyond a 'tolerable risk.' He has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited to Mexico.") The flight risk that he poses is, alone, fatal to any bail application. Accordingly, allowing bail in any amount would not reasonably

ensure his presence before this Court and would invite the possibility of embarrassing the United States in its foreign affairs.

Luna Villa's risk of flight and danger to the community are each, alone, sufficient reason for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Luna Villa posed no flight risk and no danger, the government is unaware of any "special circumstances" that would justify bail in this case.

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Mexico, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

### III. CONCLUSION

For the foregoing reasons, the United States requests that Luna Villa be detained pending resolution of this extradition proceeding.

Dated this 20TH day of September, 2023.

                                          Respectfully submitted,

                                          JAIME ESPARZA
                                          UNITED STATES ATTORNEY

By: _____
                                          IAN M. HANNA
                                          Assistant U.S. Attorney
                                          Western District of Texas